UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CHRISTIE WHITE,

        Plaintiff,

v.

        Case No. 09-CV-14344

        HON. GEORGE CARAM STEEH

HURLEY MEDICAL CENTER,

        Defendant.
_____/

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

On June 11, 2010, Plaintiff Christie White filed an amended complaint in this suit against her former employer, Defendant Hurley Medical Center, alleging "interference" and "retaliation" under the Family and Medical Leave Act relating to her layoff from employment with Defendant and "retaliation" with respect to Defendant's subsequent failure to rehire White. Before the Court is Defendant's Motion for Summary Judgment. Oral argument occurred at a hearing on this motion on October 5, 2010. For the reasons that follow, the Court denies Defendant's request for summary judgment on Counts I and II of Plaintiff's Amended Complaint and grants Defendant's request for summary judgment on Count III of Plaintiff's Amended Complaint.

## BACKGROUND

White was an employee of Hurley Medical Center who was laid off in February 2009. White began the process of requesting leave under the FMLA to care for her mother at the end of January 2009 and completed the process in early February 2009. White claims her layoff interfered with her rights under the FMLA and was in retaliation for availing herself

of FMLA-protected rights. She also claims Defendant's failure to rehire her, after a position in her former classification became available, was in retaliation for FMLA-protected acts. Defendant argues White's layoff was the result of a management directive to reduce staff. Defendant argues White's supervisor decided to reduce a position in White's classification before White made any request for FMLA leave, that White was laid off because she was the least senior employee in that job classification, and that it had no obligation to rehire her because she was a probationary employee and therefore had no recall rights.

EVIDENCE

On November 21, 2005, Defendant hired White as a Public Relations Specialist. White's reviewers gave her "very good" and "outstanding" reviews. As part of a departmental reorganization, White was promoted to Director of Event and Direct Marketing effective July 1, 2008. The Director of Event and Direct Marketing was exclusively responsible for event planning. With this promotion, White's status was probationary for the next nine months.

On July 14, 2008, Defendant hired Pamela Henderson as its Senior Vice President for Marketing and Strategic Planning and Physician Services. Henderson immediately performed an organizational review of the department and determined that the current organization resulted in fragmented distribution of staff responsibilities for Defendant's vendors. Henderson restructured the department, eliminating the Director of Event and Direct Marketing position held by White and creating three Directors of Service Line Marketing ("DSLM") positions. The DSLMs were responsible for coordinating public relations and marketing for assigned services lines (which are functionally distinct areas of the hospital, also called "cost centers"), including event planning. White understood the

2

reorganization would eliminate her Director of Event and Direct Marketing position.

The three DSLM positions were posted, first for internal applicants, and then for external applicants. White was the only internal applicant. Henderson testified "[i]t was always known that Christie would be sitting on one of those [DSLM] roles." William Morin, from Defendant's human resources department, testified that Henderson implied, at the end of August or beginning of September 2008, that she would hire White if White applied for the DSLM position. Morin also testified that White applied for the DSLM position before external candidates Mark Morrissey and David Cluley applied. White's application is dated September 9, 2008. Henderson interviewed White for the DSLM position on October 3, 2008. When asked whether White started in the new position on October 4, 2008, Henderson testified that White started "[a]round that time frame." Henderson further testified that White took on the "role and responsibility" of a DSLM in late September or early October 2008.

On October 9, 2008, Henderson asked Morin to make job offers to Morrissey and Cluley with start dates no later than November 3, 2008. Morrissey and Cluley's roster cards reflect that they were hired with effective start dates of November 3, 2008.

Henderson intended to hire White, but apparently thought she did not have to notify the human resources department to effectuate the hire because White was a qualified inside candidate. Henderson testified that she probably told Morin on or around October 3, 2008 that she had placed White in the DSLM position. On November 6, 2008, Henderson sent an email to Morin "to confirm our discussion a month ago regarding the placement of Christie White into the Director of Service Line marketing position." Following Henderson's email, the human resources department made White's transfer into the DSLM

3

position effective November 10, 2008. Pursuant to Defendant's employment policies, all three DSLMs were "probationary" for nine months after their hire dates.

Henderson testified that, at some point in time, White told Henderson that her mother was ill but provided no details regarding the illness. Henderson testified that neither White nor Henderson mentioned the FMLA. Henderson testified that she was not aware of White's request for FMLA leave. White asserts such testimony is contradicted by Morin's testimony. However, Morin testified that he was not aware in January or February of 2009 that White had requested FMLA leave. He testified that Henderson shared such information at some point, but he could not recall when she shared the information.

White testified that she told Henderson on January 29, 2009, prior to a management meeting, that she would be filing for FMLA leave because her mother was diagnosed with stage 4 cancer. White testified that Henderson indicated she did not like White leaving to care for her mother. White further testified Henderson got angry when White requested time off to care for her mother.

White completed her application for FMLA leave on January 29, 2009. White submitted her application to the human resources department on February 10, 2009.

In the two weeks following her request for time off, White claims Henderson began over-scrutinizing her work and removing service lines from her area of responsibility. White also claims Henderson made hostile remarks about White not putting enough time into her work. White testified that, during a department director's meeting in the first week of February 2009, Henderson "stated she had a problem with the work effort of some of the team members. Some members were putting in almost 60 hours a week and some were making excuses to only putting in 40." White asserts Henderson looked at her when she

referenced the team members putting in less time. White also testified that in the last week of January she told Henderson she needed to leave early and would skip lunch to make up the time and Henderson told her "[t]hat is not the way this works" and that White needed to start putting in time like a director. White testified that "[t]here were a number of comments about hours and how much time you need to be putting in in a job of that responsibility." White testified that Henderson "made it plainly clear to me that I was not putting in enough time over 40 hours."

White alleges that Henderson had an issue with employees requesting time off of work. White cites an August 26, 2008 email from Henderson to Former Vice President of Human Resources Jay Kitson regarding comp time. In the email, Henderson states that previous management had allowed staff to build banks of comp time in addition to personal and vacation time. Henderson stated that she told her team "that effective with the ending of today's pay period we will adhere to HMC's guidelines surrounding salaried employees" which meant utilizing personal days and vacation for time off, excluding time off for illness. Henderson requested an exception for a certain amount of comp time for White and another employee because of "good faith" and "prior management commitments." Henderson testified that the human resources department wanted the number of comp hours permitted for her employees to be zero, but she negotiated on behalf of her employees for 40 hours of comp time for White and another employee. She testified that comp time was not in accordance with Defendant's policies.

In December 2008, Defendant's management discussed ways to reduce expenses within the organization. Between February and June 2009, Defendant made between 30 and 45 layoffs. Defendant had another round of layoffs in June and July 2009.

In January 2009, Henderson was allegedly directed to reduce one full-time employee position. Henderson does not remember when, during the month of January, she was given this direction, but she believes it was the middle of January. Henderson testified that she chose to eliminate a DSLM position because that was the only area where there was redundancy. At one point during her deposition, Henderson testified that she made the decision to eliminate a DSLM position in February; however, at another point in her deposition, she testified that she finalized the decision in January and implemented it in February. After she decided to cut one of the three DSLM positions, she contacted the human resources department to learn about the layoff process. Defendant's Exempt Employee Handbook provides that layoffs within classifications are made in reverse order of seniority within the classification. The Handbook defines seniority as "the length of service within classification (hospital-wide) without a break in service." The human resources department told Henderson that White was to be laid off as she was the employee with the least seniority. Henderson testified that she had no reason to doubt the information from human resources because "they keep very good notes, and [she] felt that they were telling [her] what needed to happen." On February 13, 2009, Henderson notified White that she would be laid off. White testified that she responded to Henderson's notification by stating that she did not have the least seniority. White states she responded to Henderson by saying "Well, if it's by seniority, how is that me? And she said, 'You are the person with the lowest seniority in the position.'" White testified that there was no further discussion after Henderson told her she was the person with the lowest seniority in the position, and White told her "I don't understand how that is."

On February 16, 2009, White's FMLA request was approved. Henderson claims she

6

never saw White's FMLA approval letter.

During his deposition, Kitson explained that, due to White's exempt, probationary status at the time of her layoff, she was not entitled to "recall" rights. He testified that when an employee has achieved permanent status in his or her classification and is laid off, the employee has two years of recall rights to the classification. However, if the employee is laid off during a probationary period, the employee does not have recall rights. Instead, according to the employee handbook, the employee's name is placed on "the eligibility list from which they were originally certified." Kitson testified that certification is a communication from human resources to management that an employee is eligible to be considered for the position. Kitson also testified that the manager has discretion over whether or not to consider such an employee.

On May 20, 2009, one of the two remaining DSLMs, Mark Morrissey, resigned. Morin testified that he notified Henderson that White, as a laid-off probationary employee, was eligible to be considered for the opening "as an external." Henderson testified that she was not told that she should consider White for the position. She also testified that she would have considered White if she had applied for the position, and would have interviewed her. Morin testified that while the human resources department "sometimes" notifies a laid-off employee when a position in his or her former classification reopens, Morin has never sent such a letter in his five and a half years working for Defendant. Morin testified that the DSLM opening was posted on Defendant's website and that White did not submit an application. The position was filled with an external candidate.

STANDARD FOR SUMMARY JUDGMENT

Federal Rule of Civil Procedure 56(c) empowers the court to render summary judgment forthwith if the "pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." See Redding v. St. Eward, 241 F.3d 530, 532 (6th Cir. 2001). The Supreme Court has affirmed the court's use of summary judgment as an integral part of the fair and efficient administration of justice. The procedure is not a disfavored procedural shortcut. Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986).

The standard for determining whether summary judgment is appropriate is "'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" Amway Distributors Benefits Ass'n v. Northfield Ins. Co., 323 F.3d 386, 390 (6th Cir. 2003) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986)). The evidence and all reasonable inferences must be construed in the light most favorable to the non-moving party. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Anderson, 477 U.S. at 247-48 (emphasis in original).

If the movant establishes by use of the material specified in Rule 56(c) that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law, the opposing party must come forward with "specific facts showing that there is a genuine issue for trial." First Nat'l Bank v. Cities Serv. Co., 391 U.S. 253, 270 (1968); see also McLean

8

v. 988011 Ontario, Ltd., 224 F.3d 797, 800 (6th Cir. 2000).  Mere allegations or denials in the non-movant's pleadings will not meet this burden, nor will a mere scintilla of evidence supporting the non-moving party.  Anderson, 477 U.S. at 248, 252.  Rather, there must be evidence on which a jury could reasonably find for the non-movant.  Id.

ANALYSIS

**White's Interference and Retaliation Claims**

To establish an "interference" claim under the FMLA, a plaintiff must demonstrate: (1) she was an eligible employee; (2) the defendant was an employer; (3) she was entitled to leave under the FMLA; (4) she gave notice to the defendant of her intention to take leave; and (5) the defendant denied her rights to which she was entitled by the FMLA. Walton v. Ford Motor Co., 424 F.3d 481, 485 (6th Cir. 2005).

Retaliation claims under the FMLA can be established by direct or circumstantial evidence.  Gibson v. City of Louisville, 336 F.3d 511, 513-14 (6th Cir. 2003).  "[D]irect evidence is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions."  Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp., 176 F.3d 921, 926 (6th Cir. 1999). Although direct evidence cannot be based upon isolated remarks, such remarks are relevant if made by a decision-maker.  DiCarlo v. Potter, 358 F.3d 408, 416 (6th Cir. 2004). "Once there is credible direct evidence, the burden of persuasion shifts to the defendant to show that it would have terminated the plaintiff's employment had it not been motivated by discrimination."  Jacklyn, 176 F.3d at 926.

Retaliation claims based upon circumstantial evidence are evaluated under the burden-shifting framework articulated in McDonnell Douglas Corp. v. Green, 411 U.S. 792

(1973) and require as a *prima facie* case that a plaintiff show: (1) she availed herself of a protected right under the FMLA; (2) she was adversely affected by an employment decision; and (3) a causal connection exists between the exercise of the FMLA right and the adverse employment action.  Skrjanc v. Great Lakes Power Service Co., 272 F.3d 309, 314 (6th Cir. 2001).  The Sixth Circuit has summarized the burden shifting as follows:

> Under the McDonnell Douglas burden-shifting framework, once the plaintiff establishes a prima facie case of intentional discrimination, the burden shifts to the defendant to articulate a nondiscriminatory reason for its actions.  The defendant bears only the burden of production; the burden of persuasion remains with the plaintiff at all times.  Once the defendant has articulated a nondiscriminatory reason for its decision, the presumption of discrimination that arises from the plaintiff's prima facie case disappears and the plaintiff must have the opportunity to show that the defendant's proffered explanation is merely a pretext for discrimination.

Weigel v. Baptist Hosp., 302 F.3d 367, 377-78 (6th Cir. 2002) (internal citations omitted).

In Count I of her Amended Complaint, White alleges her employment was terminated in February 2009 in retaliation for availing herself of FMLA-protected rights.  In Count II, White alleges Defendant "interfered" with her rights under the FMLA when it terminated her employment.  Defendant argues White cannot sustain either claim because White was terminated as the least senior employee in her job classification during a layoff and thus cannot show a causal link between her FMLA request and her termination.  Defendant claims that Henderson merely made the decision to lay off one employee from the DSLM position, but that the human resources department determined which employee in the DSLM position had the least seniority and White's seniority was fixed by decisions in November 2008, well before any request for FMLA leave.  Defendant also asserts the individuals making the decision to terminate White's employment were not aware of White's FMLA request.

10

Construing the pleadings and evidence in a light most favorable to White, White has come forward with sufficient evidence to establish a genuine issue of material fact as to the causal connection between her leave request and her layoff. While Defendant argues that Henderson was unaware of White's FMLA request at the time of White's termination, White testified that she told Henderson that she was filing for FMLA leave on January 29, 2009, approximately three weeks before the termination. Moreover, Henderson acknowledged she was aware White's mother was ill. White testified that Henderson made statements hostile to her leave request and that Henderson's behavior toward her changed immediately following her request for time off. White alleges Henderson began over-scrutinizing her work and removing areas of responsibility.

White alleges Henderson's hostile statements immediately following her leave request constitute direct evidence of retaliation. White testified that Henderson reacted to her leave request by "indicat[ing] that she didn't like the fact that I needed all this time to take care of my mom." White testified Henderson reacted with anger. White also testified that there were a number of statements by Henderson suggesting White was not putting in enough hours. For example, in a meeting that took place during the week following White's request, White claims Henderson made a statement that certain employees were "making excuses" and not working hard enough. White alleges Henderson looked at her when she made the statement. These statements, if made by the decision-maker, could allow an inference of animus toward the leave request. Because Henderson's statements could be found directly hostile to White's leave request and were made in the short time period between her request and her termination, the Court finds the statements constitute sufficient evidence of a retaliatory motive.

11

Defendant argues that there was no retaliation because White was merely terminated as the least senior employee in her job classification during a layoff. While Henderson made the decision to lay off one DSLM, Defendant notes that the human resources department determined which employee in the DSLM position had the least seniority and that White's seniority was established by events which took place months before any leave request. However, White has presented strong evidence (including Henderson's testimony) showing she was hired into the DSLM position a month before the other DSLMs and she began performing in the role of a DSLM at least a month before the other DSLMs. Henderson hired all three DSLMs only months before the termination. Henderson was also aware of a potential issue with White's start date as she sent an email to the human resources department in November 2008 apologizing for failing to send in documentation earlier and confirming an October 2008 discussion regarding placing White into a DSLM position. Thus, while the human resources records reflect a later start date for White than for the other DSLMs, White contends Henderson knew or should have known that the seniority information provided by the human resources department for use in the termination decision was incorrect – either at the time the human resources department notified Henderson that White was the least senior employee or at the time of the termination, when White objected to Henderson's statement that she was the least senior DSLM. White asserts Henderson's failure to correct the error was the result of animus.

In further support of the causation element, White cites the temporal proximity of her leave request to her layoff. She was terminated less than three weeks after she requested leave. White alleges she had a good relationship with Henderson prior to her leave

request. White had received positive work reviews in the past, although Henderson had not formally reviewed White. After her request, White claims Henderson immediately became overly critical of White's performance, removed service lines from White's area of responsibility, and made hostile comments suggesting White was not working hard enough. White also alleges Defendant failed to follow its own policies, specifically its handbook definition of seniority, in making the termination decision. Thus, even if the hostile statements are not considered as direct evidence of retaliation, White has presented sufficient circumstantial evidence to establish a genuine issue of material fact as to the causal connection between her leave request and her layoff. Defendant's request for summary judgment on White's retaliation and interference claims relating to the February 2009 termination is therefore denied.

**White's Failure to Rehire Claim**

In <u>Wanger v. G.A. Gray Co.</u>, 872 F.2d 142, 146 (6th Cir. 1989), the Sixth Circuit found the "initial inquiry in any failure-to-rehire case is whether the employer is under an <u>obligation</u> to consider the plaintiff for the position." 872 F.2d at 146 (emphasis added). This inquiry translates into a requirement that the plaintiff show "that he applied for the available position or ... that the employer was otherwise obligated to consider him." <u>Id.</u> at 145.

In <u>Wanger</u>, the plaintiff argued that "it was not necessary for him to formally apply for the position." <u>Id.</u> at 145. At the time of his termination, the plaintiff had asked about the possibility of returning to work and was told "there is a chance if they get busy again and things pick up your phone could ring." <u>Id.</u> at 144. The court rejected the plaintiff's argument that he did not need to apply for the position because the defendant knew he was

interested in it. The court stated "the job opportunity advertisement published in the newspaper must be construed as constructive notice to [plaintiff] of the job, necessitating that he apply before alleging discrimination." Id. The defendant "publicized the position, received numerous applications, and interviewed several people for the position." Id. at 146. The court noted that "there is nothing in the record to indicate that it was [defendant's] employment practice to recall former employees or to inform them of future job openings. On the contrary, the job opportunity advertisement published in the newspaper is an indication that [defendant] had no such policy." Id. The court therefore found the plaintiff's failure to apply for the position "fatal" to his claim. Id. at 147.

In Count III, White alleges a retaliation claim under the FMLA based on Defendant's failure to rehire her in August 2009 when a DSLM position became available. Defendant argues White's failure to rehire claim must fail as White did not apply for the position and Defendant was not otherwise obligated to consider her. Defendant asserts White was a probationary employee with no rights to recall and no right to be treated differently from an external candidate who must apply to be considered for employment.

White argues Defendant was obligated to consider her for the DSLM position (even though she did not apply) under the section of the employee handbook which provides: "[p]robationary employees who are laid off will have their names returned to the eligibility list from which they were originally certified." Kitson testified that, even if there is no eligibility list, the laid-off employee is certified by human resources for a position when one becomes available. White also cites Morin's testimony that the department was made aware that White was an eligible candidate for the DSLM position when it reopened in August 2009 and Henderson's testimony that she would have interviewed White for the

position if she had applied.

However, in this case, like in <u>Wanger</u>, White has not shown that her former employer was under an obligation to consider her for the open position. She did not apply for the position. The handbook and testimony from human resources representatives simply show that White was eligible to be considered, not that she must be considered. Indeed, former Human Resources Vice-President Kitson testified that the process is such that the hiring manager has *discretion* over whether to consider the laid-off employee for the position. In addition, there is no evidence Defendant had an obligation to inform White of the opening. The opening was posted on Defendant's website. Human resources analyst Morin testified that the human resources department "sometimes" notifies a laid-off employee when a position opens, but Morin has never sent such a letter. Because White has failed to create a genuine issue of fact as to whether Defendant had an obligation to consider her for the DSLM position in August 2009, summary judgment for Defendant is appropriate on White's failure-to-rehire claim.

CONCLUSION

For the reasons set forth above, Defendant's request for summary judgment on Counts I and II of Plaintiff's Amended Complaint is denied and Defendant's request for summary judgment on Count III of Plaintiff's Amended Complaint is granted.

Dated: October 14, 2010

                S/George Caram Steeh
                GEORGE CARAM STEEH
                UNITED STATES DISTRICT JUDGE

CERTIFICATE OF SERVICE

Copies of this Order were served upon attorneys of record on October 14, 2010, by electronic and/or ordinary mail.

S/Josephine Chaffee
Deputy Clerk